## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RYAN TURNER, | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CIV-19-451-R |
| | ) | |
| XL SPECIALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff. | ) | |

## ORDER

Before the Court is Defendant XL Specialty's Motion for Summary Judgment, Doc. No. 63, and Plaintiff Mr. Turner's Cross-Motion for Partial Summary Judgment, Doc. No. 68. Both parties have responded and replied to the others' motion. Doc. Nos. 77, 80, 86, 87. Upon review, the Court grants Defendant's motion and denies Plaintiff's motion.

### I.    Background[1]

In April 2013, Aubrey McClendon founded American Energy Partners, LP (AELP). Doc. No. 63, ¶ 1; Doc. No. 68, ¶ 1. Ryan Turner was the Chief Investment Officer for both AELP and for one of AELP's affiliates, American Energy Services, LLC (AEMS), until July 2016 when he was terminated. Doc. No. 63, ¶¶ 2, 5. Prior to that date, however, AEMS, Mr. McClendon, Mr. Turner, and two other individuals who participated in the management of the AELP businesses—Scott Mueller and Thomas Blalock—entered into

---

[1] There are no disputes regarding the veracity of the facts discussed herein. *See* Doc. No. 63, ¶¶ 1–73; 80, pp. 9–70; Doc. No. 68, ¶¶ 1–21; Doc. No. 78, ¶¶ 1–21.

an Equity and Co-Investment Agreement (ECOIA) which reflected their profit-sharing agreements relating to the AELP businesses, including new businesses that had not yet been formed. *Id.* at ¶ 3. Under the ECOIA, Mr. McClendon owned a 76% interest in the profit from new domestic businesses, Mr. Turner owned a 12% interest, and Mr. Mueller and Mr. Blalock each owned a 6% interest. *Id.* Allegedly, each individual entered into the agreement as a result of his membership in AELP's Executive Management Team.

Shortly after signing the ECOIA, two additional AELP affiliates, SCOOP Energy Company, LLC (SEC) and SCOOP Energy Holdings, LLC (SCOOP Holdings) (hereinafter referred to together as "SCOOP"), were founded.[2] *Id.* at ¶ 4. Mr. McClendon, Mr. Turner, Mr. Mueller, and Mr. Blalock agreed the ECOIA should apply to the sale of any SCOOP assets. In 2016, they agreed to amend the ECOIA to explicitly include SCOOP. *Id.* at ¶ 7. But before they could execute the amendment, Mr. McClendon died on March 2, 2016. *Id.* at ¶ 11. Even so, all surviving parties to the agreement agreed that a definitive and enforceable agreement had already been reached. *Id.*

After Mr. McClendon's death, Mr. Blalock was appointed Special Administrator for Mr. McClendon's estate with authority to continue the AELP business. *Id.* at ¶ 15; Doc. No. 68, ¶ 8. ███████████████████████████████████████████ ███████████████████████████████████████████ Doc. No. 68, ¶ 9. In that same year, Mr. Blalock filed an application in the District Court of Oklahoma County, Oklahoma seeking an order permitting Mr. McClendon's estate to distribute the proceeds

---

[2] SCOOP stands for South Central Oklahoma Oil Province. *See* Doc. No. 62–3, ¶ 17.

from the sale of the SCOOP assets. Doc. No. 61–12. The application contended that the ECOIA's terms regarding the percentage interests owned by Mr. McClendon, Mr. Turner, Mr. Mueller, and Mr. Blalock applied to SCOOP. Doc. No. 63, ¶ 17. Mr. Turner subsequently filed a creditor claim against Mr. McClendon's estate to enforce the ECOIA with respect to SCOOP, seeking 12% of the profits from the sale of the SCOOP assets. *Id.* at ¶ 18. One of Mr. McClendon's other creditors, however, opposed Mr. Blalock's application to distribute the SCOOP asset-sale proceeds in accordance with the ECOIA. *Id.* at ¶¶ 19–20. Shortly thereafter, on November 10, 2016, Mr. Blalock withdrew the application for distribution of proceeds from the sale of the SCOOP assets. *Id.* at 21.

That same day, Mr. Mueller filed a lawsuit (hereinafter referred to as the *Mueller* lawsuit) in the District Court for Oklahoma County, Oklahoma naming as defendants: SCOOP, Mr. Blalock in his individual capacity, and in his capacity as Personal Representative of Mr. McClendon's estate,[3] and Mr. Turner in his individual capacity. *Id.* at 22. In his Petition, Mr. Mueller sought: (1) a declaration of the rights and liabilities of the parties, including a determination that each member of the Executive Management Team was entitled to his respective share of profits, and that employee bonuses be paid in an amount determined by the court; (2) damages for breach of contract by SCOOP and the Special Administratrix of Mr. McClendon's estate for their failure to distribute the profits-sharing interests owned by the Executive Management Team; (3) recovery of the fair value of services Mr. Mueller provided to SCOOP that he was uncompensated for; (4) the

---

[3] Kathleen McClendon was later substituted as the Special Administratrix for Mr. McClendon's estate. Doc. No. 63, ¶ 37.

imposition of a resulting trust on the net proceeds of the SCOOP assets sale by operation

of law for the benefit of Mr. Mueller; and (5) judgment against Mr. McClendon's estate

for Mr. Mueller's previously rejected creditor claim. *Id.* at ¶¶ 24, 38; Doc. No. 62–3.

In his Answer Mr. Turner either admitted or did not dispute each allegation in Mr.

Mueller's Petition. Doc. No. 63, ¶¶ 25–26, 39. He then filed his own affirmative

counterclaims, cross claims, and third-party claims seeking the same relief as Mr. Mueller.

*Id.* at ¶¶ 27, 39. Mr. Turner also asserted a crossclaim for breach of contract against SEC,

which alleged that SEC owed him payment for consulting work. *Id.* at ¶¶ 28, 39.

Six months into the *Mueller* lawsuit, Mr. Heath Hibbard—a non-executive SCOOP

employee—intervened. *Id.* at ¶ 29. He filed an Answer wherein he agreed with Mr. Mueller

that non-executive employees were entitled to share in an employee bonus pool and took

no position on the other relief sought by Mr. Mueller. *Id.* at ¶ 30. Mr. Hibbard also filed

counterclaims and crossclaims seeking: (1) declaratory judgment against SCOOP, the

Special Administrator, Mr. Blalock, Mr. Mueller, and Mr. Turner, recognizing the right,

title and obligations of all parties regarding their interests in the profits from the sale of the

SCOOP assets; (2) imposition of a resulting trust against SCOOP, the Special

Administrator, Mr. Blalock, Mr. Mueller, and Mr. Turner for the amount due to Mr.

Hibbard and the other associates from the sale of the SCOOP assets; (3) damages for breach

of contracts against SCOOP; (4) damages for breach of partnership agreement against

SCOOP, the Special Administrator, Mr. Blalock, Mr. Mueller and the SEC partnership; (5)

damages for breach of fiduciary duty against SCOOP, Mr. Mueller, and Mr. Blalock; (6)

unjust enrichment against SCOOP; and (7) action on his rejected claim against the Special Administrator. *Id.* at ¶ 31; Doc. No. 62–1.

In answering Mr. Hibbard's cross claims, Mr. Turner denied that Mr. Hibbard was entitled to the relief he sought. Doc. No. 62–5, ¶¶ 99, 104. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

On June 7, 2017, Mr. Turner's counsel forwarded the filings in the *Mueller* lawsuit to Mr. Turner's insurance broker who sent the filings to Defendant XL Specialty seeking coverage for Mr. Turner's legal expenses under AELP's Company and Management Liability Policy. *Id.* at ¶¶ 62–64. According to the policy, XL Specialty—as the insurer— was obligated to pay "on behalf of the Insured Person Loss resulting from a Claim first made against the Insured Person during the Policy Period . . . for a Wrongful Act . . . ." Doc. No. 62–17, p. 24. Mr. Turner's counsel claimed that Mr. Turner was entitled to coverage as a defendant in the *Mueller* lawsuit. *See* Doc. No. 63, ¶ 66. In two separate letters sent on July 27, 2017 and March 16, 2018, XL Specialty denied Mr. Turner's coverage claim. *Id.* at ¶¶ 65, 69. Therein, XL Specialty denied coverage under the policy

based upon its determination that Mr. Turner was sued by reason of his status as an equity holder in various businesses, rather than in his status as an "Insured Person" and therefore, no claim was asserted against him for a "Wrongful Act" as defined under the policy. Doc. Nos. 62–27; 62–31. XL Specialty also determined that while Mr. Turner was a named defendant in the *Mueller* lawsuit, the policy did not provide coverage for Mr. Turner's prosecution of his affirmative claims. Doc. Nos. 62–27; 62–31.

Soon after this denial of coverage, it was discovered that Mr. Turner did not actually own the 12% interest originally provided to him under the ECOIA. *See* Doc. Nos. 62–12, 63–8. Instead, he had distributed his stake amongst three companies—Trawler Investments, LLC, Trawler Investments II, LLC, and Trawler Investments III, LLC (the Trawler Companies)—that he and his wife Whitney Turner owned. *Id.* Based upon this information, the District Court found that the Trawler Companies were the real parties in interest and joined them as third-party claimants to the *Mueller* lawsuit. Doc. No. 63, ¶ 48.

Six days later, on April 9, 2018, the parties entered into a confidential settlement agreement. Pursuant to the agreement, Mr. Turner received a share of the proceeds from the sale of the SCOOP assets. *Id.* at ¶ 51. Mr. Turner's wife and the Trawler Companies also executed a release, consenting to be bound by the agreement. Doc. No. 63–9, p. 22.

On May 17, 2019, Mr. Turner filed this lawsuit against XL Specialty seeking reimbursement for the legal expenses he accumulated in the *Mueller* lawsuit. Doc. No. 1. In his Complaint, Mr. Turner alleges that XL Specialty breached the insurance contract and its implied duty of good faith and fair dealing when it denied coverage in 2017, thereby failing to advance and reimburse his legal expenses. Doc. No. 63, p. ¶¶ 33–44. He also

6

seeks attorney's fees, costs, and pre-judgment interest. *Id.* at ¶ 45. Both parties have since filed motions for summary judgment. Doc. Nos. 63, 68.

## II.   Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). In assessing whether summary judgment is appropriate, the Court views the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Williams v. FedEx Corp. Services*, 849 F.3d 889, 896 (10th Cir. 2017).

The parties' filing of cross-motions for summary judgment does not change this standard of review. *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000). The Court is to consider each motion on its own merits; "the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth,* 608 F.2d 431, 433 (10th Cir. 1979). "To the extent the cross-motions overlap, however, the court may address the legal arguments together." *Skogen v. City of Overland Park*, No. CIV.A. 08-2657-DJW, 2010 WL 973375, at *3 (D. Kan. Mar. 16, 2010), *aff'd sub nom. Skogen v. City of Overland Park, Kan.*, 404 F. App'x 327 (10th Cir. 2010). If the granting of one motion requires the denial of the other, the Court need not delve into the other motion separately. *See Arroyo v. Geico Cas. Co.*, No. 2:16 CV 511, 2019 WL 415252, at *2 (N.D.

7

Ind. Jan. 29, 2019) (noting that where cross-motions for summary judgment overlap, "[i]t is wasteful and unnecessary to address each motion separately."). The Court begins with the first motion filed—Defendant XL Specialty's Motion for Summary Judgment.

### III.    Defendant XL Specialty's Motion for Summary Judgment

### A.  Breach of Contract[4]

In this diversity action, Oklahoma substantive law governs the Court's analysis. *See Eden v. Neth. Ins. Co.*, 834 F.3d 1116, 1120 (10th Cir. 2016). To establish breach of contract, a plaintiff must prove: "1) formation of a contract; 2) breach . . . ; and 3) damages . . . ." *Digital Design Group. Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).

In support of its motion, and in opposition to Mr. Turner's cross-motion, Defendant XL Specialty focuses on the second element, arguing that it could not have breached the insurance contract because the policy did not cover Mr. Turner's involvement in the *Mueller* lawsuit. *See* Doc. No. 63, pp. 26–32; Doc. No. 78, pp. 11–22. First, it argues that Mr. Turner is not covered under the insurance policy because the *Mueller* lawsuit did not implicate a "Wrongful Act" as defined by the policy—Mr. Turner was a party to the lawsuit in his individual capacity as an equity holder entitled to the proceeds from the sale of the SCOOP assets, not in his status as an "Insured Person". Doc. No. 63, pp. 26–30; Doc. No. 78, pp. 12–15. Second, it argues that Mr. Turner is not covered because he incurred no

---

[4] The parties' arguments regarding Mr. Turner's claim for breach of contract substantially overlap. *Compare* Doc. Nos. 63, pp. 22–35, 80, pp. 9–28 *with* Doc. Nos. 68, pp. 13–21, 25–30, 78, pp. 9–13, 17–19. The Court addresses the overlapping arguments together. *See Skogen v. City of Overland Park*, No. CIV.A. 08-2657-DJW, 2010 WL 973375, at *3 (D. Kan. Mar. 16, 2010), *aff'd sub nom. Skogen v. City of Overland Park, Kan.*, 404 F. App'x 327 (10th Cir. 2010).

"Loss" as defined under the policy—his legal fees were spent in pursuit of affirmative relief, not in defense of any claim.  Doc. No. 63, pp. 30–32; Doc. No. 78, pp. 15–19.

In support of his cross-motion, and in response to XL Specialty's motion, Mr. Turner argues that the term "capacity" is not in the insurance policy and is therefore inapplicable. Doc. No. 68, pp. 17–18, 25–29; Doc. No. 80, p. 9–10, 12–15. He contends that he is covered under the policy because he was involved in the *Mueller* lawsuit by reason of his "status" as a member of the Executive Management Team and partner to the ECOIA, qualifying him as an "Insured Person". Doc. No. 68, pp. 17–18, 25–29; Doc. No. 80, p. 9–10, 12–15. As to XL Specialty's second argument, Mr. Turner alleges that the policy does not require that he be placed in a defensive posture to obtain coverage. Doc. No. 68, p. 20; Doc. No. 80, pp. 10–12. He argues that his legal expenses are "Loss" in the form of "Defense Expenses" and that his affirmative claims are clearly covered after considering the policy as a whole. Doc. No. 68, pp. 20, 27; Doc. No. 80, pp. 21–27.

No Oklahoma court has spoken directly to these issues. Therefore, the Court must address them by applying basic contract principles, as an Oklahoma court would do if presented with a contractual issue of first impression. *See First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland*, 928 P.2d 298, 302 (Okla. 1996); *Armijo v. Ex Cam, Inc.,* 843 F.2d 406, 407 (10th Cir. 1988) ("If the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue."). To determine whether XL Specialty had a duty to pay for Mr. Turner's legal expenses under the AELP Company and Management Liability Policy, the Court must first look to the language of the policy. *Spears v. Shelter Mut. Ins.*

*Co.*, 73 P.3d 865, 868–869 (Okla. 2003). The Court will determine whether that language is ambiguous, and then address the parties' contractual arguments in turn.

### i.  Policy Language & Ambiguity

The relevant policy provision—Section I(A)—states that "[t]he Insurer shall pay on behalf of the Insured Persons Loss resulting from a Claim first made against the Insured Persons during the Policy Period that, in whole or in part, alleges, is based upon, arises from or is in consequence of any Wrongful Act." Doc. No. 62-17, p. 15.

XL Specialty argues that because there are no ambiguities in this policy language, the terms are easily interpreted in their favor and any potential ambiguity should not be construed against it because the parties negotiating the policy were sophisticated. Doc. No. 63, p. 24; Doc. No. 78, pp. 10–11. Mr. Turner objects, arguing that the doctrine of adhesion and reasonable expectations require the Court to interpret the policy in his favor. Doc. No. 68, pp. 14–15; Doc. No. 80, p. 27–28.

"In Oklahoma, unambiguous insurance contracts are construed, as are other contracts, according to their terms." *See Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996). "The interpretation of an insurance contract and whether it is ambiguous is determined by the court as a matter of law." *Max True Plastering Co.*, 912 P.2d at 869.

> Insurance contracts are ambiguous only if they are susceptible to two constructions. In interpreting an insurance contract, this Court will not make a better contract by altering a term for a party's benefit. We do not indulge in forced or constrained interpretations to create and then to construe ambiguities in insurance contracts.

*Id.* (internal citations omitted). "[I]n the event of ambiguity or conflict in the policy provisions, a policy of insurance is to be construed strictly against the insurer and in favor of the insured." *Spears*, 73 P.3d at 868. In doing so, courts are required to apply the reasonable expectations doctrine "to aid . . . in discerning the intention of the parties . . . ." *Id.* "Under the reasonable expectations doctrine, when construing an ambiguity or uncertainty in an insurance policy, the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean." *Id.* at 869.

The Court finds no ambiguity with respect to the policy language excerpted above. In his Complaint, his response to XL Specialty's motion, and his cross-motion, Mr. Turner claims that by his involvement in the *Mueller* lawsuit—and in accordance with Section I(A) of the policy—he suffered "Loss" in the form of "Defense Expenses" resulting from a claim made against him for a "Wrongful Act." Doc. No. 1; Doc. No. 68; Doc. No. 80. XL Specialty objects. *See, e.g.*, Doc. No. 63. "Loss" is defined in the policy at Section II(P) as "damages, judgments, payments, settlements, relief or other amounts . . . and Defense Expenses . . . ." Doc. No. 62–17, p. 28. "Defense Expenses" is defined at Section II(F) as "reasonable legal fees and expenses incurred in the investigation and defense of any Claim . . . ." *Id.* at 26. Notably, the insurance policy does not define the term "defense" in its definitions section or within the definition of "Defense Expenses". Black's law Dictionary defines "defense" as "[a] defendant's stated reason why the plaintiff or prosecutor has no valid case . . . that which is alleged by a party proceeded against in an action or suit, as a

reason why the plaintiff should not recover or establish that which he seeks by his complaint or petition." DEFENSE, Black's Law Dictionary (11th ed. 2019).

"Wrongful Act" is defined as a "matter asserted against, or investigated or inquired with respect to, an Insured Person by reason of his or her status as an Insured Person." Doc. No. 62–17, p. 29. And as relevant to the case, an "Insured Person" is defined under the policy as "any past, present or future employee, director, officer, manager, partner, . . . [or] member of the Board of Managers of the Company . . . ." *Id.*

The plain meaning of the language above is clear. Therefore, the Court does not deviate from it. *See BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835 (Okla. 2005); *see also Mount Vernon Fire Insurance Company v. Visionaid, Inc.*, 76 N.E.3d 204, 208 (Mass. 2017) (citing *Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 66 (1st Cir. 2012). And because the Court finds no ambiguity, the policy language need not be construed against the Defendant-Insurer, nor must the Court apply the reasonable expectations doctrine.

### ii.   Section I(A): "Wrongful Act"

In XL Specialty's first contractual argument, it contends that Mr. Turner is not covered under the insurance policy because he was not involved in the *Mueller* lawsuit because of a "Wrongful Act" as required by Section I(A). Doc. No. 63, pp. 26–30; Doc. No. 78, pp. 13–17. As noted, "Wrongful Act" is defined under the policy as a "matter asserted against, or investigated or inquired with respect to, an Insured Person by reason of his or her status as an Insured Person." Doc. No. 62–17, p. 27. And an "Insured Person" is defined as "any past, present or future employee, director, officer, manager, partner, . . .

[or] member of the Board of Managers of the Company . . . ." *Id.* XL Specialty specifically contends that Mr. Turner does not qualify for coverage under this policy language because he was a party to the *Mueller* lawsuit in his individual capacity as an equity holder, not in his status as an "Insured Person". Doc. No. 63, pp. 26–30; Doc. No. 78, pp. 13–17. Mr. Turner argues that XL Specialty confuses the terms capacity and status and incorrectly uses them interchangeably. Doc. No. 68, p. 25–27; Doc. No. 80, p. 10. He also contends that he is due coverage because he was involved in the *Mueller* lawsuit by reason of his status as an "Insured Person"—a member of the Executive Management Team, and partner to the ECOIA. Doc. No. 68, p. 28–30; Doc. No. 80, p. 10–12.

The Court finds, as a preliminary matter, that the terms capacity and status are interchangeable here. Mr. Turner's own attempt to distinguish the terms demonstrates their similarity. *See* Doc. No. 68, p. 25–26 (defining status as a "position or rank" and capacity as "duty, position, [or] role"); *see also* Doc. No. 80, p. 10, n.1 (citing case law for the proposition that the policy's use of "status" is likely "an attempt to cover vicarious liability").[5]

Next, the Court finds that Mr. Turner was not involved in the *Mueller* lawsuit by reason of his status as an "Insured Person". He was involved in the action because of his status, or in his capacity, as an individual equity holder under the ECOIA, which allegedly provided him an interest in the proceeds from the sale of the SCOOP assets. Mr. Mueller,

---

[5] Under Oklahoma law, "[v]icarious liability is imposed by law when one . . . is made answerable for the actionable conduct of another." *See Burke v. Webb Boats, Inc.*, 37 P.3d 811, 814 (Okla. 2001). For example, a corporation is vicariously liable for the actions of its agent when the agent is conducting the corporation's business. *See id.* (citing *Nadeau v. Melin*, 110 N.W.2d 29, 34 (Minn. 1961)).

Mr. Blalock, Mr. Turner, and Mr. McClendon's estate are all claimants to the profits from the sale of the SCOOP assets. Although Mr. Turner acquired his stake by entering into an agreement—the ECOIA—with other members of the Executive Management Team, Mr. Turner was not sued by Mr. Mueller or Mr. Hibbard by reason of his membership on the Executive Management Team, or because of his connection to the AELP businesses. For example, Mr. Hibbard's counterclaim implicated Mr. Turner only because of his "interest in the profits from the sale of the SCOOP assets." *See, e.g.*, Doc. No. 62–1, ¶ 98. And that interest was not connected to Mr. Turner's status as a member of the Executive Management Team. *See* Doc. No. 61–1, pp. 10, 16 (recording that Mr. Turner entered into the ECOIA, not as a member of the Executive Management Team, but simply as "Ryan A. Turner"). This conclusion is buttressed by the fact that none of Mr. Mueller or Mr. Hibbard's claims asserting breach of contract or fiduciary duty were asserted against Mr. Turner. *See* Doc. No. 62–1; Doc. No. 62–3. As exemplified above, the only claims that involved Mr. Turner were those that deal specifically with the distribution of interests in the profits from the sale of the SCOOP assets. *See* Doc. No. 62–1; Doc. No. 62–3.[6]

Moreover, Mr. Turner does not provide any factual support to dispute XL Specialty's asserted material facts that Mr. Turner was involved in the *Mueller* lawsuit in his individual, as opposed to his corporate capacity. Doc. No. 63, ¶¶ 40, 41. Instead, he contends that the reason he was included in the *Mueller* lawsuit was because of his status

---

[6] If Mr. Turner was involved in the *Mueller* action in a status other than his individual status, it would be in his status as a part owner of the Trawler Companies, not in his status as an "Insured Person". The District Court found, and this Court agrees, that under Oklahoma law, the three companies owned by Mr. Turner and his wife—the Trawler Companies—were the real parties in interest because the companies, not Mr. Turner, owned the rights to a share in the profits from the sale of the SCOOP assets. *Id.*

as a "partner" to the ECOIA. *Id.* He alleges that "it is irrelevant that [he] was . . . a recipient of the proceeds to be distributed." Doc. No. 68, p. 29. The policy's definition of "Insured Person" includes "any . . . partner . . . of the Company," Doc. No. 62–17, p. 27, and the "Company" is defined under the policy as AELP or its subsidiaries. *Id.* at 26, 28, 2. Mr. Turner provides no information indicating that he was a partner of AELP or any its subsidiaries. That Mr. Turner was referred to as a "partner" in the ECOIA does not make him a partner of AELP or its subsidiaries for purposes of coverage under the policy. Additionally, statements made by Mr. Turner's counsel during the *Mueller* lawsuit debunk the contention that Mr. Turner's equity interest was irrelevant to the case. In describing the matter to the District Court of Oklahoma, Mr. Turner's counsel stated plainly: "the case is about . . . the equity interests." Doc. No. 62–33, p. 32:11–12.

For the above-mentioned reasons, the Court finds that Mr. Turner was not involved in the *Mueller* lawsuit by reason of his status as an "Insured Person". Defendant XL Specialty therefore did not breach the policy by denying coverage; it is accordingly entitled to summary judgment on Mr. Turner's breach of contract claim.

### iii.   Section I(A): "Loss"

Even if Mr. Turner was involved in the *Mueller* lawsuit by reason of his status as an "Insured Person", summary judgment is still warranted in favor of XL Specialty because Mr. Turner does not qualify for coverage under Section I(A) of the policy as he did not suffer a covered "Loss". As mentioned previously, "Loss" is defined as "damages, judgments, payments, settlements, relief or other amounts . . . and Defense Expenses . . . ." Doc. No. 62–17, p. 28. Mr. Turner claims that because he was a defendant in the *Mueller*

lawsuit, his legal expenses are properly categorized as "Defense Expenses".[7] Doc. No. 68, p. 20; *see also* Doc. No. 80, p. 11–12. "Defense Expenses" is defined as "reasonable legal fees and expenses incurred in the investigation and defense of any Claim . . . ." *Id.* at 26. As noted above, the policy does not define the term "defense". Black's Law Dictionary defines "defense" as "[a] defendant's stated reason why the plaintiff or prosecutor has no valid case . . . that which is alleged by a party proceeded against in an action or suit, as a reason why the plaintiff should not recover or establish that which he seeks by his complaint or petition." DEFENSE, Black's Law Dictionary (11th ed. 2019).

Applying the contractual language of "Loss" and "Defense Expenses" to the facts of this case, the Court finds that the legal expense for which Mr. Turner seeks reimbursement was not incurred in the *Mueller* lawsuit to demonstrate why Mueller had no valid case, nor to demonstrate why Mr. Mueller shouldn't have recovered what he sought.[8] In his Petition, Mr. Mueller brought five claims against five named defendants—though, only one claim involved Mr. Turner. Doc. No. 62–3. In that claim, Mr. Mueller sought declaratory judgment, affirming the rights and liabilities of the parties, including a determination that each member of the Executive Management Team is entitled to his

---

[7] Mr. Turner also suggests in different filings that the *Mueller* lawsuit resulted in a "Loss" because it involved a request for "relief", *see* Doc. No. 80, p. 27, and a request for declaratory "judgment", *see* Doc. No. 1, ¶ 30. The Court need not spend much time on either contention. The policy defines "relief" in its definition of "Loss" as "including fines or penalties, taxes, punitive or exemplary damages, the multiplied portion of any damage award, where insurable by law, and any pre-judgment or post-judgment interest that is awarded on any judgment." Doc. No. 62–7, p. 28. The policy does not, however, define "judgments". Nevertheless, the *Mueller* lawsuit was settled by all the parties involved. Thus, Mr. Turner was not ordered to pay any kind of "relief" as defined under the policy language above, nor did the claims result in a "judgment" against Mr. Turner. To the extent Mr. Turner contends that his legal expenses are covered "Loss" under any other category, he fails to provide facts to support those contentions.

[8] Where, as here, coverage involves the question of whether a plaintiff-insured has suffered a covered loss, "the insured has the burden of showing that a covered loss has occurred . . . ." *Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1298 (10th Cir. 2000).

respective share of profits, and that employee bonuses be paid in an amount determined by the court. *Id.* at 12–13. This claim did not place Mr. Turner in a defensive posture. Rather, it appears that Mr. Mueller asserted the claim for the benefit of himself and Mr. Turner.

Consistent with the above, in his Answer, Mr. Turner did not dispute any of Mr. Mueller's material facts, nor did he dispute or oppose any of Mr. Mueller's requested relief. Doc. No. 62–4. Instead, Mr. Turner asserted seven counterclaims and crossclaims, requesting the same relief that Mr. Mueller requested in his Petition. *Compare* Doc. No. 62–4, p. 16–21 *with* Doc. No. 62–3, p. 12–17. Specifically, both Mr. Mueller and Mr. Turner requested entry of a declaratory judgment recognizing the Executive Management Team's interest in the profits from the sale of the SCOOP assets; both asked for the imposition of a resulting trust; both claimed that SCOOP, and the Special Administratrix should be held liable for breach of contract for not distributing the profits from the sale of the SCOOP assets to the Executive Management Team; both asked for recovery of the fair value of services they allegedly provided to SCOOP, and; both requested action on their failed creditor claims. *See* Doc. No. 62–4, p. 16–21; Doc. No. 62–3, p. 12–17.

While Mr. Turner was nominally pleaded as a "defendant" in the *Mueller* lawsuit, the pleadings demonstrate clearly that he stood in the same posture as Mr. Mueller, seeking affirmative relief against SCOOP, and the Special Administratrix to Mr. McClendon's estate. Further validating this conclusion, it is undisputed that before the *Mueller* lawsuit was filed, Mr. Turner's counsel reviewed a draft of Mr. Mueller's Petition and conferred with both Mr. Turner and Mr. Mueller regarding the substance of the Petition. Doc. No. 63, ¶ 23; Doc. No. 80, ¶ 23. Mr. Turner's legal expenses were thus not incurred in defense

17

of Mr. Mueller's claims. Accordingly, the legal expenses Mr. Turner incurred are not "Defense Expenses," and as such they are not covered "Loss" under the insurance policy at issue here.

Mr. Turner argues in the alternative that to the extent a defensive posture is required of him, the claims asserted by Heath Hibbard placed him in that position. Doc. No. 80, p. 16–17. Heath Hibbard, a non-executive employee under the AELP platform of companies, intervened in the *Mueller* lawsuit approximately six months after the case was filed. Doc. No. 63, ¶ 29. He asserted counterclaims and crossclaims against all parties in order to protect a portion of the profits from the sale of the SCOOP assets that he alleged was owed to non-executive employees. Doc. No. 62–1. Mr. Hibbard made seven claims, only two of which were asserted against Mr. Turner. Those two crossclaims included: (1) declaratory judgment recognizing the right, title and obligations of all parties to the action regarding their interest in the profits from the sale of the SCOOP assets; and (2) imposition of a resulting trust on all profits from the sale of the SCOOP assets for the benefit of Mr. Hibbard and certain other non-executive employees.[9] *Id.* at ¶¶ 97–104. While Mr. Turner's initial Answer indicates that he opposed Mr. Hibbard's crossclaims, *see* Doc. No. 62–5, ¶¶ 99, 104, it is undisputed that Mr. Turner believed Mr. Hibbard was entitled to the relief he was seeking. *See* Doc. No. 63, ¶ 36 (alleging in statement of material undisputed facts that

"█████████████████████████████████████████████████████████

---

[9] Mr. Turner argues that Mr. Hibbard's other five claims are relevant because they implicate Mr. Turner's fiduciary duties as a member of the Executive Management Team, including promises the Management Team allegedly made to Mr. Hibbard and the other SCOOP associates. Doc. No. 80, p. 15–18. He is incorrect. As discussed twice before, none of the other five claims were pleaded against Mr. Turner. Doc. No. 62–1, ¶¶ 105–126. Those claims are therefore irrelevant to his alleged defense.

████████████████████████ Doc. No. 80, p. 7–8 (failing to dispute Defendant's statement of material fact); *see also* Doc. No. 62–4, ¶¶ 31–33 (recording Mr. Turner's admission that non-executive employees are entitled to "a pool of up to 5% of the profits" from the sale of SCOOP assets); *cf. First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland*, 928 P.2d 298, 303, n.15 (Okl. 1996) (noting that a court's interpretation of an insurer's duty to defend is not determined solely based on the pleadings but takes into account other sources of information).

Mr. Turner points to no material demonstrating that his legal expenses were incurred to invalidate Mr. Hibbard's crossclaims. He only argues that Mr. Hibbard's claim to the proceeds of the sale of the SCOOP assets would dilute his own share of the profits, and therefore he was forced to "defend" against Mr. Hibbard's crossclaims. Doc. No. 80, p. 17. However, as stated above, Mr. Turner did not ultimately oppose Mr. Hibbard's dilution; he admitted that the non-executive employees had a right to share in the profits from the sale of the SCOOP assets. *See* Doc. No. 63, ¶ 36; *see also* Doc. No. 62–4, ¶¶ 31–33.

Mr. Turner bears the burden of showing that the legal expenses he incurred during the *Mueller* lawsuit are "Defense Expenses" and thus covered "Loss" under the policy. *See Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1298 (10th Cir. 2000). Mr. Turner fails to satisfy this burden. Defendant XL Specialty had no obligation under the policy to pay for Mr. Turner's legal expenses which were incurred in pursuit of affirmative relief, rather than in defense of a claim. Accordingly, the Court concludes that XL Specialty did not breach the insurance policy when it denied coverage in 2017. Defendants are therefore entitled to summary judgment on Mr. Turner's breach of contract claim.

This conclusion is supported by most federal and state courts that have considered a related issue: Whether an insurer's "duty to defend" includes an obligation to prosecute affirmative counterclaims and crossclaims.[10] Consistent with the Court's approach above, most federal and state courts have found that an insurer's duty to defend does not include such an obligation. *See, e.g., Spada v. Unigard Ins. Co.*, 80 F. App'x 27, 29 (9th Cir. 2003); *Aldous v. Darwin Nat'l Assurance Co.*, 851 F.3d 473, 483 (5th Cir. 2017), *vacated in part on other grounds on reh'g*, 889 F.3d 798 (5th Cir. 2018); *see also* Robert Goodman and Valerie Pennacchio, *MULTIPLE PATHS Does the Duty to Defend Include an Obligation to Fund Counterclaims?* 59 No. 5 DRI For Def. 31, at ¶¶ 5–9 (May 2017) (collecting cases).

Mr. Turner responds by arguing that the cases analyzing an insurer's duty to defend are irrelevant because the insurance policy here does not contain such a clause. That the policy here does not include a duty to defend does not invalidate the Courts use of precedent discussing that type of clause. The duty to defend is sufficiently analogous to XL Specialty's duty to pay "Defense Expenses" and the Court is within its purview to use duty-to-defend case law in elucidating the contours of XL Specialty's duty—an issue of first impression under Oklahoma law.

Courts interpreting the duty to defend utilize the basic tools of contract interpretation. *See, e.g., Spada*, 80 F. App'x at 29. Here, the Court has likewise conducted its own contract interpretation, as required under Oklahoma law, and found that XL Specialty's duty to pay "Defense Expenses" does not include the duty to assist Mr. Turner

---

[10] Generally, the duty to defend requires an insurer to participate in the defense of the insured person. The duty to pay defense expenses on the other hand simply requires the insurer to pay for the legal fees of an insured person.

in obtaining the relief he sought in the *Mueller* lawsuit. That most courts to address the related duty to defend have found the duty doesn't include an obligation to pay the legal expenses associated with claims for affirmative relief serves only to buttress the Court's own contract interpretation. What's more, in his own summary judgment briefing, Mr. Turner equates the duty to pay "Defense Expenses" discussed herein with the duty to defend. *See* Doc. No. 87, p. 3.

Mr. Turner's final two arguments fail to alter the Court's interpretation of the policy. First, he argues that the policy's exclusions provision, Section III(B), demonstrates how his legal fees are covered "Loss". Doc. No. 68, pp. 27–28; Doc. No. 80, p. 21–22. Section III(B) of the policy states:

> The Insurer shall not be liable to make any payment for Loss in connection with that portion of a Claim made against an Insured: . . .
>> (B) brought about exclusively in fact by any intentionally dishonest, fraudulent or criminal act or omission or personal financial profit or remuneration gained by any Insured to which such Insured is not legally entitled; as determined by a final non-appealable adjudication in the underlying action. However, the Exclusion (B) shall not apply to any Claim(s) made against any independent director or to Defense Expenses.

Doc. No. 62–17, p. 29. Put in simpler terms, this provision means that XL Specialty could be liable for the "Defense Expenses" associated with an "Insured Person's" defense of claims brought against him exclusively because of his, as relevant here, personal financial profit or remuneration to which he is not legally entitled. Highlighting the treatment of "Defense Expenses" and "personal financial profit," Mr. Turner claims that it would be absurd if the policy required XL Specialty to pay the defense costs for an insured person accused of obtaining financial profit for which he is not legally entitled, but not the defense

costs incurred by an insured person named as a defendant in a lawsuit where he was seeking gains to which he is legally entitled.

Mr. Turner's argument is flawed in that it assumes that he was defending against claims asserted against him. The Court has already found that Mr. Turner's legal expenses were not incurred in the defense of any claim in the *Mueller* lawsuit. Accordingly, the Court finds no merit in Mr. Turner's attempt to interpret Section III(B) as supporting coverage of his legal expenses.

Second, Mr. Turner contends that even if some of his legal expenses did not constitute "Loss" under the policy, others did, and the allocation clause demands that all of his legal fees be considered covered "Loss". Doc. No. 80, pp.  20–22. The policy's allocation clause provides:

> If a Claim covered in whole or in part under the Policy results in both Loss covered under this Policy and loss not covered by this Policy, because such a Claim includes both covered and uncovered matters . . . the Insureds and the Insurer shall allocate 100% of such amounts to covered Loss.

Doc. No. 62–17, p. 30. Mr. Turner states, without much explanation, that the claims implicating his fiduciary duties as a member of the Executive Management Team for the AELP companies, in addition to Mr. Hibbard's claim for a part of the profit from the sale of the SCOOP assets—which would serve to dilute his own interest—are "undoubtedly covered matters." Doc. No. 80, p. 24–25. He therefore argues that even if his other counterclaims and crossclaims are deemed not covered as "Loss" under the policy, the allocation clause requires payment for all his legal expenses. *Id.*

As the Court previously concluded, there were no claims against Mr. Turner that implicated his fiduciary duties. The only claim for breach of fiduciary duty made in the *Mueller* lawsuit was Mr. Hibbard's claim against SCOOP, Mr. Mueller, and Mr. Blalock. Doc. No. 62–1, p. 18. Additionally, the Court has already demonstrated that Mr. Turner did not ultimately oppose Mr. Hibbard's claim to a share of the profits from the sale of the SCOOP assets. As such, Mr. Turner cannot be said to have "defended" against Mr. Hibbard's claims, as required for coverage under the terms of the policy. At bottom, Defendant XL Specialty is entitled to summary judgment on Mr. Turner's claim for breach of contract.

### B. Breach of Implied Duty of Good Faith and Fair Dealing

Under Oklahoma law, an "insurer has an implied-in-law duty to act in good faith and deal fairly with the insured to ensure that . . . policy benefits are received." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1314 (10th Cir. 2019). The first element Mr. Turner is required to demonstrate to make out a prima facie case of bad faith is that **"**he was covered under the . . . insurance policy . . . ." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005). Based upon this element, the Tenth Circuit has held that "an insurer does not breach its duty when it denies a claim and a court subsequently concludes that there was, in fact, no coverage for the claim under the insurance contract." *Cudd Pressure Control, Inc. v. New Hampshire Ins. Co.*, 645 F. App'x 733, 748 (10th Cir. 2016) (citing cases applying Oklahoma law). Here, the Court has determined that there was no coverage for Mr. Turner's claim under the insurance contract. Defendant XL Specialty is therefore entitled to summary judgement on Mr. Turner's bad faith claim.

IV.     **Plaintiff Mr. Turner's Cross-Motion for Partial Summary Judgment**

In Mr. Turner's cross-motion, Doc. No. 68, he argues that XL Specialty breached its contractual obligations because he is covered under the AELP Management and Liability Insurance Policy as an "Insured Person" who suffered a covered "Loss" resulting from a "Claim" initiated against him for a "Wrongful Act". *Id.* at 16–29. Significantly, the Court has already addressed two of the linchpins in Mr. Turner's cross-motion—whether he was involved in the *Mueller* lawsuit by reason of his status as an "Insured Person", and whether his legal expenses, incurred in the *Mueller* lawsuit, are covered "Loss" under the policy. Having found in favor of Defendant XL Specialty on these issues, and having adjudged that XL Specialty did not breach the insurance policy by denying coverage in 2017, the Court must deny Mr. Turner's cross motion which seeks contrary determinations.

V.      **Conclusion**

For the foregoing reasons, the Court hereby grants Defendant XL Specialty's Motion for Summary Judgment, Doc. No. 63, and denies Plaintiff Mr. Turner's Motion for Partial Summary Judgment, Doc. No. 68.

**IT IS SO ORDERED** this 30th day of June 2020.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**